# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James H. Alesia | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 5552 | **DATE** | March 20, 2001 |
| **CASE TITLE** | *Donna R. Mingo vs. Roadway Express, Inc.* | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. The court grants defendant's motion *in limine* [31-1, 31-2]. Further, the court grants in part and denies in part defendant's motion for summary judgment [12-1].

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| ✓ | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

number of notices

MAR 2 1 2001
date docketed

C.S.
docketing deputy initials

date mailed notice

Document Number

33

CW
courtroom deputy's initials

Date/time received in central Clerk's Office

mailing deputy initials

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DOCKETED

MAR 2 1 2001

| | | |
|---|---|---|
| DONNA R. MINGO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No: 99 C 5552 |
| | ) | |
| ROADWAY EXPRESS, INC., | ) | Judge James H. Alesia |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court is defendant Roadway Express, Incorporated's motion for summary judgment. For the following reasons the court grants in part and denies in part defendant's motion for summary judgment.

## I. BACKGROUND[1]

Defendant Roadway Express Incorporated ("Roadway") is a common carrier in the "less-than-truckload" transportation business. In the present action, Mingo is suing Roadway under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*, claiming that Roadway violated Title VII by (1) subjecting her to a sexually-charged, hostile-working environment; (2) refusing to offer her a seven-on/seven-off working schedule because of her sex; and (3) retaliating against her for complaining about the harassing behavior. This court has subject-matter jurisdiction over the case pursuant to 42 U.S.C. § 2000e-5(f)(3).

---

[1]Unless otherwise indicated, the following facts are taken from the parties' Local Rule 56.1 statements.

In order to understand this court's opinion, one must be aware of a number of facts. For the sake of clarity, a recitation of these facts is in three parts. Part A discusses the relevant policies and procedures in place at Roadway. Part B discusses Mingo's employment history at Roadway. Part C discusses events which relate to Mingo's sexual harassment, sex discrimination, and retaliation claims.

A.     **Roadway's Policies and Procedures**

Roadway has several policies in place to combat workplace discrimination. First, there are Roadway's Equal Employment Opportunity Policy and EEO Policy and Implementation Memorandum (collectively referred to as "the EEO policy"). That policy clearly states that sexual harassment will not be tolerated by any employee, vendor, or supplier. The policy also defines sexual harassment as "unwanted verbal and/or visual conduct, or unwanted physical contact resulting in a sexually hostile work environment; or, unwanted sexual advances or demands for sexual favors to obtain a job-related benefit or to avoid an adverse employment action." (Def.'s App., Ex. E.) Further, the policy states that every employee is responsible for ensuring that Roadway's policies are followed.

If, however, an employee believes that he or she was subjected to sexual harassment, in violation of Roadway's policies, the policy sets forth a procedure for filing such a complaint:

Internal Review Procedure

If you believe you are the victim of sexual harassment or violations of the Company equal employment opportunity policy, you may submit your concerns, in writing, setting forth full particulars, to:

Roadway Express, Inc.
Office of the General Counsel
Internal Review Processing
1077 George Boulevard, P.O. Box 471
Akron, OH 44309-0471

(*Id.*) During the course of its supervisor training program, Roadway instructs the trainees on its policy regarding sexual harassment. Each employee is given a copy of the policy, and the training instructor goes over that policy during a training program called "EEO 2 – Lay of the Land." This policy is also posted on a bulletin board at Roadway's Chicago terminal.

Moreover, during that training program, Roadway states that prospective supervisors are instructed that, in addition to the written procedures for filing a harassment grievance, employees can also direct such complaints to the Terminal Manager or the Assistant Terminal Manager at his or her facility. At the facility where Mingo worked, the Terminal Manager was Glenn Kaminski ("Kaminski") and the Assistant Terminal Manager was Neil Dewey ("Dewey"). However, Mingo claims that she was instructed to bring any complaints to her immediate supervisor – in this case, that would be her outbound managers Scott Birmingham ("Birmingham") and Doug Mikolajczak ("Mikolajczak").

Further, Roadway has also adopted a Corporate Code of Conduct which also prohibits sexual harassment and instructs employees who believe that they have been subjected to harassing conduct to file a written complaint to Roadway's Office of the General Counsel. (Def.'s App., Ex. T.) In fact, with respect to reporting concerns regarding sexual harassment, the Code of Conduct has the exact same language as found in Roadway's EEO policy. This Code of Conduct

3

is given to each employee when he or she is hired. Mingo received this Code of Conduct, and she signed a document acknowledging her receipt.

## B.    Mingo's Employment History

Mingo was hired by Roadway on February 22, 1997. At that time, she was hired as management trainee. Then, following completion of Roadway's supervisor training program, Mingo was promoted to outbound dock supervisor on June 22, 1997. This promotion was routine and did not result in a change in Mingo's job duties.

Mingo was hired to work at Roadway's Chicago terminal. The Terminal Manager for that site is Kaminski; the assistant terminal manager is Dewey. The hierarchy is as follows: Mingo's direct supervisors were the outbound terminal managers, Birmingham and Mikolajczak; Birmingham and Mikolajczak reported to Dewey who, in turn, reported to Kaminski.

Mingo's duties as a supervisor included overseeing the dock workers' performance (*i.e.*, to supervise the loading and unloading of freight to and from trailers). Mingo was also responsible for the safe, timely and cost-effective movement of freight out of the Chicago terminal. In order to fulfill this responsibility, Mingo had the responsibility of making sure that the trailers were loaded properly, on time and pursuant to applicable safety standards. Mingo was also responsible for handling all paperwork related to the movement of the outbound freight. Further, it was also Mingo's responsibility to counsel and discipline the dock workers whom she supervised.

Prior to her promotion on June 22, 1997, Mingo took part in a week-long supervisor training course held at Roadway's corporate headquarters. During this training program, Mingo

was instructed on various company policies and procedures. This included training on Roadway's sexual harassment policies and procedures. Further, in conjunction with her training, but prior to the week-long course, Mingo also attended a grievance arbitration – relating to the discharge of a Roadway employee who sexually harassed two female, Roadway employees – with Dewey.

## 1. **Mingo's performance reviews**

From the beginning of her employment, Mingo received poor to marginal performance reviews. In 1997, Mingo was cited for failing to meet many of her duties and responsibilities in a satisfactory manner, including among other things: (1) failure to load trailers on time; (2) failure to properly and/or fully load trailers; (3) failure to complete paperwork properly; (4) failure to comply with the Department of Transportation's hazardous material regulations; and (5) failure to confront and counsel dock workers (her subordinates) who were not performing their duties. Further, on September 12, 1997, Mingo's formal evaluation stated that her job performance was unacceptable or marginal in most aspects. The following year did not see much improvement in Mingo's performance. During 1998, Mingo was admonished several times for failing to properly load the trailers and for failing to follow proper procedures in handling hazardous materials. At the start of 1998, Mingo's weekly performance evaluations showed that she was rated "poor" in nearly all areas. Further, Mingo was advised that her attendance needed to improve as well. On April 18, 1998, following two serious mistakes – one in which Mingo sent a truck to the wrong location and another in which she placed the wrong paperwork on an outbound trailer – Mingo

was admonished by Dewey that any more violations of Roadway's procedures would result in disciplinary action and possible discharge.

Mingo had her second, formal performance evaluation on April 16, 1998. At that evaluation, Mingo received an overall rating of "marginal." However, she was rated "unacceptable" in those categories relating to her adherence to safety procedures and on-time completion of her work. Although she disagreed with some of her ratings, Mingo did not credit her failures to Roadway or her managers. In fact, on April 21, 1998, in a checklist made for Roadway, Mingo stated that she received adequate support from both her work crew and the management personnel at Roadway. Despite receiving adequate support and direction from Roadway, Mingo's poor job performance continued.

Between mid-April and mid-June, 1998, Mingo made several loading and paperwork mistakes. In one instance, Mingo again mishandled hazardous materials. Her July 17, 1998 weekly evaluation showed that Mingo rated only poor or fair in all areas. Although her July 25, 1998 weekly evaluation showed slight improvement, Mingo continued to receive reprimands for not loading trailers properly. Further, on August 26, 1998, Mingo was advised by Dewey that her attendance was unsatisfactory. The following day, Birmingham advised Mingo of another series of loading errors which included loading a trailer far below weight, while falsely reporting it full, and failing to secure the freight.

### 2. Mingo's request for a schedule change

Around June 25, 1998, Mingo met with Kaminski to request a change in her work schedule. Her schedule at that time had Mingo working five days on and two days off. Mingo,

however wanted a seven-on/seven-off schedule. With that schedule, Mingo would work seven days in a row and then have seven days off. A transfer to a seven-on/seven-off schedule would not have been a promotion; it would not have changed Mingo's rank; and it would not have affected Mingo's salary, benefits, hours or job responsibilities. However, the change in schedule would have required Mingo to work in areas on the dock where she had not previously worked. At the June 25, 1998 meeting, Kaminski did not offer Mingo a seven-on/seven-off schedule. He told Mingo that he did not offer her that schedule because of her poor performance. However, Kaminski told Mingo that if her performance improved over the following month or two, then he would consider offering her a seven-on/seven-off schedule. Further, Kaminski suggested that Mingo meet with Mikolajczak to help her improve her performance.

During Mingo's employment at Roadway, several other male, dock supervisors – namely, Steve Vahey, Victor Martin, Bruce Duncan and Emanual Robinson – did not work the seven-on/seven-off schedule. In fact, neither party has identified any Roadway employee who did work that schedule. From the record, however, it appears that at least one male worked a seven-on/seven-off schedule while he was in training. (Pl.'s App., Ex. 3 at 62:13-24.)

On August 29, 1998, Kaminski decided to terminate Mingo's employment. Kaminski states that this decision was made because Mingo failed to improve her job performance, thereby costing Roadway money and impairing customer service. Kaminski was the sole decision-maker. However, Kaminski asked Mikolajczak and Birmingham to inform Mingo of her termination.

## C.    Events Leading Up To Mingo's Claims

Mingo claims that she was subjected to sexual harassment during her employment at Roadway. Specifically, Mingo claims that, beginning in March of 1998, various dock workers, co-workers, and some of her subordinates made sexually charged comments which were directed at her. Mingo claims she was sexually harassed during the following incidences:

- March 27, 1998: Steve Vahey, a supervisor of equal rank, asked Mingo if she had ever dated a white man, propositioned her, and then laughed.
- June 12, 1998: Victor Martin, a supervisor of equal rank, asked Mingo whether she had hurt her back engaging in sexual activities.
- June 18, 1998: David Keys, a dock worker whom Mingo supervised, said that Mingo looked good and he wanted "kiss and suck [Mingo] in [her] pooh pooh la la." (Def.'s App., Ex. B at 148:4-13.)
- June 24, 1998: Keys asked Mingo for a strawberry (Mingo was sitting at a desk eating strawberries at the time) and, while Keys was eating the strawberry, he told Mingo that is how he would eat her. (*Id.* at 155:15-156:2.)
- July 9, 1998: Noel Gutierrez, a dock worker whom Mingo supervised, while discussing the bible with another dock worker, told Mingo that her backside looked like a "donkey's ass."
- July 10, 1998: James Petty, a dock worker whom Mingo supervised, asked Mingo if her nipples stood up like pencil erasers when it is cold then laughed and walked away.
- August 6, 1998: Mingo asked Bruce Macchia ("Macchia"), a supervisor of equal rank, if he dyed his hair, and he responded that his hair "is the same color that is on my dick." He then asked Mingo if she wanted to see it. When Mingo told Macchia that he shouldn't talk like that, he told her that she should not ask whether he dyes his hair.
- August 20, 1998: While walking with Macchia, Mingo heard his pants making a squeaking noise and asked him if he used a lot of starch in his pants. Macchia then replied that "he needed a lot of starch in his pants to carry all of this big dick that he had." (*Id.* at 196:22-197:13.)
- August 21, 1998: Charlie Brown, a dock worker whom Mingo supervised, told Mingo that he would cook her breakfast and eat it off her body.
- August 28, 1998: Charlie Brown told Mingo that she looked good and began caressing her arm. Mingo also claims that he was pulling at her shirt.
- August 29, 1998: John Nagel, a spotter in a non-supervisory position, asked Mingo if she stripped on weekends.

(*See* Def.'s Rule 56.1(a) Statement at ¶¶ 48-58.) In most of these incidents, Mingo responded to the sexual comments, telling the speaker that she did not like that kind of talk. And for the most part, the speaker laughed and walked away. Mingo never reprimanded, counseled or disciplined any of those dock workers whom she supervised for their comments.

The first time Mingo complained about these incidents was on June 24, 1998. At that time, Mingo spoke with her direct supervisor, Mikolajczak, about the comments made by Keys and Vahey. Mingo stated that she did not think Mikolajczak took her complaints on June 24, 1998 seriously. Some time later that week, Mingo complained to Mikolajczak about Martin, and he told her that Martin was being fired for other reasons. Then, on August 22, 1998, Mingo reported the remaining incidents to Mikolajczak. Mingo never filed a written complaint to the Office of the General Counsel, nor did she ever report the incidents to Kaminski or Dewey. According to Mingo, the reason she did not report these incidents to Kaminski or Dewey is because she was concerned about being portrayed as a slut.

## II. DISCUSSION

This matter is currently before the court on Roadway's motion for summary judgment. Roadway contends that it is entitled to summary judgment as a matter of law on Mingo's sexual harassment claim because (1) Mingo has failed to allege conduct which amounts to a hostile environment and (2) Roadway did not have adequate notice of any alleged harassment and, therefore, cannot be liable under Title VII. Roadway further contends that it is entitled to summary judgment as a matter of law on Mingo's sex discrimination claim because: (1) in basing this claim on the denial of a seven-on/seven-off work schedule, Mingo has failed to allege

an adverse employment action; (2) there is no direct evidence of discrimination; (3) Mingo has

not established that she met Roadway's legitimate expectations and that similarly situated males

were given the seven-on/seven-off schedule as required to state a prima facie case of

discrimination; and (4) alternatively, even if Mingo could satisfy her prima facie case, she has

failed to establish that Roadway's proffered, nondiscriminatory reason for denying the seven-

on/seven-off work schedule is pretextual. Finally, Roadway argues that it is entitled to summary

judgment as a matter of law on Mingo's retaliation claim because Mingo has failed to establish

a causal link between her complaint of sexual harassment and the decision to terminate her

employment.

### A.    Roadway's Motion *in Limine*

As a threshold matter, the court will dispose of Roadway's motion *in limine*.  Roadway

seeks to exclude the following: (1) the tape-recorded conversation which took place at Mingo's

termination and (2) a racially-biased statement allegedly made by an employee of Roadway.

Mingo has not responded to the motion.

First, Roadway seeks to exclude the tape-recorded conversation between Mingo and

employees of Roadway which occurred during her termination interview.  Roadway argues that

such tape recording was made in violation of the Illinois Eavesdropping Act, 720 ILL. COMP.

STAT. 5/14-1 *et seq.*, and therefore must be excluded.  The court agrees.  Under the Illinois

Eavesdropping Act, a person is prohibited from recording any part of a conversation without the

consent of all the parties to the conversation. 720 ILL. COMP. STAT. 5/14-2(a)(1). Further, under

the Eavesdropping Act, any evidence "obtained in violation of this Act is not admissible in any

civil or criminal trial, or any administrative or legislative inquiry or proceeding, nor in any grand jury proceedings..." *Id.* § 14-5. Thus, the tape recorded conversation of Mingo's termination interview is excluded.

Second, Roadway seeks to exclude any evidence regarding a racially derogatory statement allegedly made by Michael Saviano, an employee of Roadway. Roadway argues that the statement is hearsay and, in the alternative, more prejudicial than probative. The court agrees that the statement is hearsay. Mingo did not hear the statement made but was told by another employee that Saviano made the statement. Thus, the statement is hearsay and is excluded. However, although Mingo has failed to respond to this motion *in limine*, she could have perhaps argued that the statement is not being offered for the truth of the matter asserted, but as evidence of a hostile work environment. In that case, the court finds that the prejudicial nature of the statement outweighs any probative value that statement may have. First, Mingo did not hear the statement being made but was told by another employee that Saviano made such a statement. There is no evidence that the other employee will testify that the statement was, in fact, made. Further, this is a sexual harassment case, it is not based on claims of racial discrimination. Thus, the statement has little probative value, but it is highly prejudicial. The statement is, therefore, excluded. *See* FED. R. EVID. 403. Accordingly, the court grants Roadway's motion *in limine* in its entirety.

## B. <u>Local Rule 56.1</u>

Before addressing the merits of this summary judgment motion, the court must address the requirements under Local Rule 56.1. Local Rule 56.1, formerly Local General Rule 12, sets

11

forth guidelines for litigants moving for and opposing summary judgment. Under the local rule, the party moving for summary judgment must file, among other things, a "statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." LOC. R. 56.1(a)(3). The required statement must consist of short numbered paragraphs, including within each paragraph specific cites to the record which support the facts set forth. *Id.*

Further, a party opposing a motion for summary judgment must file a response to the movant's statement of facts, including specific answers for each numbered paragraph in the movant's statement. LOC. R. 56.1(b)(3)(A). Specifically, Local Rule 56.1(b) requires that the opposing party file, among other things:

> [A] concise response to the movant's statement that shall contain: (A) a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon, and (B) a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials.

LOC. R. 56.1(b)(3). Any facts that are not *specifically* denied will be deemed admitted in considering the motion for summary judgment. *Id; see also Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 527-28 (7th Cir. 2000). Moreover, when a non-moving party fails to comply with Local Rule 56.1(b), all facts set forth in the moving party's statement will be deemed admitted. *Michas v. Health Cost Controls of Illinois, Inc.* 209 F.3d 687, 689 (7th Cir. 2000). More importantly, if a non-moving party files a response to the movant's 56.1 statement but fails to comply with the strict requirement of Local Rule 56.1(b), it is firmly within the district

court's discretion to strike the entire response. *Bordelon*, 233 F.3d at 528-29. The Seventh Circuit has "consistently and repeatedly upheld a district court's strict compliance with its local rules governing summary judgment." *Id.* at 527.

In this case, the movant, Roadway, filed a proper Rule 56.1(a) statement. Roadway has offered specific cites to the record which support each of the seventy-six paragraphs contained in its Statement of Facts. However, in opposing the motion for summary judgment, Mingo has failed to file a proper response under Local Rule 56.1(b). First, Mingo has not filed any response to the seventy-six specific, numbered paragraphs contained in Roadway's Statement of Facts. Thus, all of the facts contained in those paragraphs are deemed admitted as they are uncontested. *Dade v. Sherwin-Williams Co.*, 128 F.3d 1135, 1140 (7th Cir. 1997); *see also Stewart v. McGinnis*, 5 F.3d 1031, 1033-34 (7th Cir. 1993) (holding that facts alleged in a Rule 56.1(a) statement are deemed admitted if they are supported by the record). Second, Mingo has filed a "Rule 56(e) [sic] Statement of Material Disputed Facts" with her response to the motion for summary judgment. Because Mingo has failed to comply with Local Rule 56.1(b), the court could strike this entire response and not consider those facts alleged in Mingo's Statement of Disputed Facts. *See Bordelon*, 233 F.3d at 527-28. However, in fairness to Mingo, the court will not strike her response in its entirety, but the court will address the propriety of that response.

Mingo's Statement of Disputed Facts consists of twenty-three numbered paragraphs. Paragraphs 2, 3, 4, 8, 11, 15, 16, 18, 19, 20, 22, 23 contain no citation to any part of the record. Therefore, those paragraphs are stricken. *See* LOC. R. 56.1 (requiring specific reference to the record); *see also Brasic v. Heinemann's Inc.*, 121 F.3d 281, 285 (7th Cir. 1997) (holding that it

is not the task of the courts to scour the record in search of a genuine issue of material fact).

Paragraph 1 contains a cite to the record; however, the portion cited – Mingo's employment application – does not support the claims in that paragraph. Therefore, paragraph 1 is stricken. Paragraph 5 cites to Mingo's own affidavit for support. However, the statements made in that affidavit contradict Mingo's own deposition testimony. Mingo's deposition testimony is controlling, and, therefore, paragraph 5 is stricken. *Piscione v. Ernst & Young*, 171 F.3d 527, 532-33 (7th Cir. 1999) (holding that a party cannot create an issue of fact by manufacturing a conflict in her own testimony with an affidavit which contradicts her earlier deposition testimony); *see also Unterreiner v. Volkswagen of Am., Inc.*, 8 F.3d 1206, 1211 (7th Cir. 1993) (holding that a party who discounts his knowledge on a subject cannot raise a genuine issue of fact by later contradicting that testimony). Paragraph 7 cites to Exhibit 4 which is the deposition transcript of Kaminski. However, Mingo has failed to pinpoint a specific cite within that deposition. Likewise, paragraphs 9, 10, 12, 17 and 23 cite generally to Mikolajczak's deposition but fail to cite a specific portion of the deposition. Again, the court will not seek out support for Mingo's claims. Thus, paragraphs 7, 9, 10, 12, 17 and 23 are stricken.[2] *See* Loc. R. 56.1 (requiring specific reference to the record); *see also Brasic*, 121 F.3d at 285 (holding that it is not the task of the courts to scour the record in search of a genuine issue of material fact). In sum, the court strikes paragraphs 1-5, 7-12, and 15-23.

---

[2]Further, the court notes that in its reply to Mingo's Statement of Disputed Facts, Roadway denies the claims made in those paragraphs and provides citations to the record which support those denials, thereby disproving the claims made in those paragraphs.

Paragraphs 6 and 13 cite to Mingo's own affidavit in support of the claims made. Further, paragraph 14 cites to specific pages of Mingo's deposition testimony in support of the claims made. The court will consider those paragraphs in ruling on the motion for summary judgment. In its reply to Mingo's Statement of Disputed Facts, Roadway admits the claims in paragraphs 6 and 14 but denies the claims made in paragraph 13. Thus, the only fact in dispute is whether Mingo was instructed to report any sexual harassment to her supervisor – that being Mikolajczak – or whether she was instructed to report such incidents to either the terminal manager or assistant terminal manager. However, the court notes that paragraph 19 of Roadway's Statement of Undisputed Facts states that Mingo was instructed to report any incidents either to the counsel's office or to the terminal manager or assistant terminal manager. Because Mingo failed to respond to that paragraph, that fact is deemed admitted.

**C.    Standard for Deciding a Motion for Summary Judgment**

A motion for summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of material facts exists for trial when, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir. 1995).

The burden is on the moving party to show that no genuine issues of material fact exist. *Anderson*, 477 U.S. at 256; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party presents a prima facie showing that it is entitled to judgment as a matter of law, the non-moving party may not rest upon mere allegations or denials in her pleadings, but must set forth specific facts showing that a genuine issue for trial exists. *Anderson*, 477 U.S. at 256-57; *Celotex*, 477 U.S. at 324; *Schroeder v. Luftansa German Airlines*, 875 F.2d 613, 620 (7th Cir. 1989).

**D. Sexual Harassment Claim – Hostile Work Environment**

In order to establish a sexual harassment claim under Title VII, Mingo must show that the harassment was so "severe or pervasive" that it altered the conditions of her employment with Roadway and created an abusive working environment. *Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998). Specifically, to establish a prima facie case of hostile environment sexual harassment claim, Mingo must show that: (1) she was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors, or other verbal or physical conduct that is sexual in nature; (2) the harassment was based on her sex; (3) the harassment unreasonably interfered with her work performance in creating an intimidating, hostile, or offensive environment which seriously affected the psychological well-being of the plaintiff; and (4) there is a basis for employer liability. *Id.* (citing *Rennie v. Dalton*, 3 F.3d 1100, 1107 (7th Cir. 1993)). In its current motion, Roadway claims that it is entitled to summary judgment as a matter of law because (1) Mingo has failed to allege a basis for employer liability

and (2) the alleged conduct was not so severe or pervasive as to affect Mingo's working environment.

## 1.  **Employer liability**

An employer's liability for a hostile environment sexual harassment claim depends upon whether the harasser is the victim's supervisor or merely a co-employee. *Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)). In the case of a co-worker being the harasser, the courts have found that, because an employee lacks the authority with which they might harass (in contrast to a supervisor who has authority), an employer is liable only when the employer has been "negligent either in discovering or remedying the harassment." *Id.* (quoting *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997)). An employer's legal duty in co-employee harassment cases will be discharged if it takes reasonable steps to discover and rectify any harassment of an employee. *Id.* In the present case, most of the harassers were not supervisors but were low-level dock workers. In fact, some of the men who Mingo claims harassed her were supervised by Mingo herself. Although Mingo was a supervisor, "plaintiff's status as supervisor of those harassing [her] ... is a non-issue" and the court must look at the employer's knowledge and response. *Moffett v. Gene B. Glick Co.*, 621 F. Supp. 244, 272 (N.D. Ind. 1985), overruled on other grounds *Reeder-Baker v. Lincoln Nat'l Corp.*, 644 F. Supp. 983 (N.D. Ind. 1986); *see also McDonnell v. Cisneros*, 84 F.3d 256, 260 (7th Cir. 1996) (holding that, in theory, a male supervisor could be sexually harassed by his subordinates). Further, the remaining alleged harassers were employees with the same rank as Mingo. Thus, because the alleged harassers were

of equal or lesser rank than Mingo, the court must determine Roadway's liability using the co-employee standard.

Under the standard for co-employee harassment, an employer's legal duty is discharged if it takes reasonable steps to discover and rectify the harassment. *Parkins*, 163 F.3d at 1035. However, courts have found that it is unrealistic to expect management "'to be aware of every impropriety committed by every low-level employee.'" *Parkins*, 163 F.3d at 1035 (quoting *Carr v. Allison Gas Turbine Div., Gen. Motors Corp.*, 32 F.3d 1007, 1009 (7th Cir. 1994)). Thus, the Seventh Circuit has determined that notice or knowledge of the harassment is a prerequisite for liability. *Parkins*, 163 F.3d at 1035; *Perry*, 126 F.3d at 1014.

In determining whether an employer has notice, the court must first determine whether the employer has a designated channel for employees to bring their harassment complaints. *Parkins*, 163 F.3d at 1035; *Young v. Bayer Corp.*, 123 F.3d 672, 674 (7th Cir. 1997). In a situation where an employer has designated a specific person or persons to accept complaints, this person "becomes the natural channel for the making and forwarding of complaints." *Young*, 123 F.3d at 674. However, where the designated person was not accessible or was not identified by the company, an employer can receive notice of harassment through a department head or someone "the complainant *reasonably believed* was authorized to receive and forward (or respond to) a complaint of harassment." *Id.* (emphasis in original). However, to withstand summary judgment, Mingo must present evidence that she gave Roadway enough information to make a reasonable employer think there was some probability that she was being sexually harassed. *See Parkins*, 163 F.3d at 1035.

18

In this case, Roadway clearly had a written policy for filing sexual harassment complaints. That EEO policy states that an employee should submit, in writing, all complaints of sexual harassment to the Office of the General Counsel. Although Mingo claims that she cannot remember what documents she received at her training, it is undisputed that this policy was handed out to all supervisors, including Mingo, during their training period. Further, Mingo signed a document acknowledging receipt of Roadway's "Code of Corporate Conduct." (Def.'s App., Ex. T.) Like the EEO Policy, the Code of Conduct states that all complaints regarding violations of company policies – including the prohibition of sexual harassment – must be directed to the Office of the General Counsel. Thus, because it is undisputed that Roadway gives copies of this policy to each employee – coupled with the fact that Mingo did sign for the Code of Conduct – the court accepts that Mingo did have constructive, if not actual, notice of Roadway's policy against sexual harassment – and, consequently, she had notice of Roadway's written procedures for handling such complaints. Further, the policy was posted in the work place for employees to read. Thus, Mingo should have been aware of Roadway's policy. Yet Mingo did not follow Roadway's written policy for reporting sexual harassment complaints – a fact that is undisputed.

However, despite having a clear, written policy and procedure, Roadway claims that it had another avenue for reporting sexual harassment claims. Specifically, Roadway states that the employees are told during their supervisor training program that any complaints of sexual harassment can be reported to the Terminal Manager, Kaminski, or to the Assistant Terminal Manager, Dewey. This policy is not written and is not found anywhere in Roadway's policy on

sexual harassment. As proof of this unwritten policy, Roadway cites to the affidavit of Edward

Stockton, an instructor at Roadway's training program, who states that all employees are

informed of this unwritten policy for reporting sexual harassment during the training program.

Mingo, on the other hand, claims that she was told during her training to report any such claims

to her supervisor – in this case, that would be either Birmingham or Mikolajczak, the outbound

managers at the Chicago terminal. Again, this is not written policy and Mingo cites only to her

own deposition testimony and to her affidavit in support of this contention.

It appears, therefore, that there is an issue of material fact regarding Roadway's unwritten

policy. Mingo may, in fact, have followed the unwritten policy established by Roadway by

reporting her complaints to her supervisor. The fact that this is an unwritten policy makes it

impossible for the court to determine whether or not Mingo followed its terms. If Roadway

wanted employees to bring complaints to some managers, it should have specified exactly who

those persons were in a written policy. Further, because Roadway is the movant, the court must

resolve all disputes in favor of Mingo. The court finds that this is a question of fact going to the

credibility of one witness over another. The court cannot say that a reasonable juror could not

find that this unwritten policy allowed employees to bring their complaints to their immediate

supervisors. This turns on the issue of witness credibility – a determination that is within the

exclusive province of a fact-finder at trial. *See Kornely v. Carson's Ribs of Deerfield, Inc.*, No.

99 C 3357, 2000 WL 1788348, at *9 (N.D. Ill. Dec. 4, 2000).

Moreover, even it the court accepted as true that Mingo failed to use either of Roadway's

procedures for reporting sexual harassment complaints, that would not end the court's inquiry.

20

The court must determine whether she reported the alleged harassment to someone who could "reasonably be expected to refer the complaint up the ladder to the employee authorized to act on it." *Young*, 123 F.3d at 675. The Seventh Circuit has held that persons – even if they are supervisors – who lack authority to correct harassment, address grievances, or terminate or discipline employees are not, as a matter of law, employees who can reasonably be expected to refer complaints of sexual harassment to the appropriate people. *See Parkins*, 163 F.3d at 1037-38. In *Parkins*, the Seventh Circuit found the plaintiff was unreasonable in reporting sexual harassment complaints to a supervisor with limited discretionary or decision-making authority, especially in light of the fact that plaintiff had daily access to and observance of people with authority to correct the problem. *Parkins,* 163 F.3d at 1038. The only person Mingo complained to was the outbound manager, her supervisor, Mikolajczak. Thus, the court must determine if it is reasonable for Mingo to believe that he would refer her complaint to the appropriate persons.

Roadway does not present any evidence regarding Mikolajczak's authority, responsibilities, or duties as an outbound manager. In fact, Roadway does not address Mikolajczak's status at all. However, Roadway does present evidence that Mingo, a supervisor working under Mikolajczak, had the authority to discipline the dock workers (her harassers) for their harassing behavior. It is logical, therefore, that Mikolajczak had the authority to discipline the same workers. However, the evidence also shows that Kaminski had sole decision-making authority for work schedules. (Def.'s App., Ex. A at ¶ 10.) Further, it was Kaminski who made the decision to terminate Mingo's employment, although it is unclear if he had the sole decision-making authority regarding decisions to terminate employment. (*Id.* at ¶ 14.) Thus, it appears

that Mikolajczak had the authority to address grievances and to discipline employees, but it is unclear if he had the authority to terminate employees' employment. However, although Kaminski may have had ultimate authority, Mikolajczak did have some authority and responsibility over Mingo's employment as well. In fact, while some of Mingo's performance reviews and reprimands were from Dewey (the assistant terminal manager), Mikolajczak also wrote up some of Mingo's reprimands. Further, it appears that Mikolajczak completed at least some of Mingo's weekly performance evaluations. (Def.'s App., Ex. O.) It appears, therefore, that Mikolajczak – as outbound manager – had the authority to discipline employees, write reprimands, and evaluate employees' job performance. In other words, he was not a manager in name only but, on the contrary, had at least some authority to address and correct problems or grievances. Thus, the court finds that Mingo was not, as a matter of law, unreasonable in bringing her complaints to Mikolajczak as it was reasonable for her to believe that he could be expected to convey the complaints to the proper persons (*i.e.*, Dewey or Kaminski).

Finally, Roadway also argues that, even if it was reasonable to bring her complaints to Mikolajczak in the beginning, Mikolajczak's lack of response to Mingo's complaints made it unreasonable for her to come to him a second time. It is possible that such a situation can occur. *See Parkins*, 163 F.3d at 1038 (finding that any reasonableness in reporting complaints to a supervisor was evaporated when that supervisor took no action and the harassment continued for nearly two years before the plaintiff complained to another).

In this case, Mingo first told Mikolajczak of the alleged harassment in June of 1998. The alleged harassment continued until August of 1998. In August, Mingo again reported the conduct

of her workers to Mikolajczak. Although the harassment continued, it appears that Mikolajczak did speak to at least one of the harassers. (*See* Pl.'s App., Ex. 3 at 19:7-18.) Roadway now contends that it was unreasonable for Mingo to believe that Mikolajczak would report her complaints to the appropriate person because, as she claims, the harassment continued for months after she spoke to Mikolajczak. Mingo, on the other hand, claims that she brought her complaints to Mikolajczak because he was her immediate supervisor, and he was the person she dealt with on a daily basis.[3]

In this case, Mingo spoke to Mikolajczak in June regarding the conduct of various dock workers. In her deposition, Mingo admits that she did not think that Mikolajczak took her complaints seriously, a fact that is undisputed. (*See* Def.'s Rule 56.1(a) Statement ¶ 60 (citing Def.'s App., Ex. B at 159:19-23).) However, she also contends that she thought he was the person she was supposed to talk to regarding sexual harassment. Further, although Mikolajczak admits that he did not think that Mingo was complaining to her about sexual harassment, he did speak to some of the workers after Mingo talked to him. Mingo then complained to Mikolajczak again in August, approximately two months after her first complaint. The court finds that this is not unreasonable as a matter of law. *See Parkins*, 163 F.3d at 1037-38 (finding that an employee becomes unreasonable when no action is taken regarding her sexual harassment claims and yet

---

[3] Mingo goes so far as to argue that she had little or no contact with Dewey. (Def.'s App., Ex. B at 43:9-20.) The court has serious doubts with respect to Mingo's contention that she had little contact with Dewey. In fact, Mingo talked to both Kaminski and Dewey about getting a new seven-on/seven-off schedule. (Pl.'s App., Ex.6 at 181:18-20.) Further, during the period when the alleged harassment took place, Dewey sent several letters or memos to Mingo regarding her job performance.

she waits *several years* before bringing her complaints to another). Had she remained at Roadway and the alleged harassment continued, perhaps her third complaint should have been directed to another. But, in this case, Mingo complained two times in a period of two months to her immediate supervisor. Thus, the court cannot say that a reasonable juror could not find that Mingo was reasonable in bringing her complaint to Mikolajczak.

In sum, the court finds that there is an issue of fact regarding Roadway's unwritten policy on reporting complaints of sexual harassment. Further, even if Mingo did not follow Roadway's policy, a reasonable juror could find that she was reasonable in bringing her complaints to Mikolajczak. Thus, the court finds that Roadway had notice of Mingo's sexual harassment complaints. Accordingly, there is a basis for Roadway's liability for the sexual harassment complained of by Mingo.

2.    **The severity and pervasiveness of the conduct**

A plaintiff pursuing a hostile environment claim must show that her work environment was both subjectively and objectively offensive – "'one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" *Gentry v. Exp. Packaging Co.*, 238 F.3d 842, 850 (7th Cir. 2001) (quoting *Faragher*, 524 U.S. at 787). For sexual harassment to be actionable, "'it must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Id.* (quoting *Meritor Sav. Bank, FSB, v. Vinson*, 477 U.S. 57, 67 (1986)). To determine whether conduct is so severe or pervasive as to be actionable, the court must look at all the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically

24

threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). Further, while the effect on an employee's psychological well-being is relevant, no one factor is determinative. *Id.* However, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* (quoting *Faragher*, 524 U.S. at 788).

The Seventh Circuit has stated that it is often difficult to draw the line between vulgar banter and harassment and to define what constitutes a hostile work environment. *Id.*; *see also Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 806 (7th Cir. 2000). However, in this case, there are strong indicators that the environment was hostile. The incidents persisted for over five months; many workers either explicitly or implicitly invited her to enter into sexual relations with them and used vulgar language in doing so, which Mingo was stated was humiliating to her as a woman and as a supervisor; and one employee caressed her arm. During this entire time, Mingo was one of the few women working on the loading dock. From an objective standpoint, a reasonable juror could conclude that this behavior created a hostile working environment.

Subjectively, however, there is little evidence that Mingo perceived her environment as hostile. The only evidence that might show Mingo was bothered by the comments is that, in most instances, she told the speaker that she did not like that kind of talk and that she reported the conduct to her supervisor on two or three occasions. Also, Mingo testified that she was humiliated by the comments and offended when Charlie Brown pulled at her shirt. On the other hand, Mingo has presented no evidence that she was psychologically affected by her work

environment: there is no evidence that she suffered from depression, anxiety or that she sought medical care for any psychological problems that were the result of an oppressive workplace environment. In fact, except for her own statements, there is no evidence that she was upset by the comments made to her by her co-workers. *Cf. Gentry*, 238 F.3d at 851 (finding that a plaintiff's statements that she often cried when going to work, which was supported by statements of co-workers who saw or heard her crying, coupled with evidence that plaintiff sought medical treatment for anxiety and depression were enough to support a reasonable juror's finding of a subjectively hostile environment). Further, there is no evidence that Mingo was unable to perform her duties at work because of the harassment. In fact, Mingo's performance rating was the same or worse in 1997 as it was in 1998 when the alleged harassment took place. This said, the court is mindful that psychological harm is not required to establish a hostile working environment but is only one factor to consider. *Id.; see also Harris*, 510 U.S. at 23. Further, whether she felt harassed by the alleged conduct is an issue which hinges on Mingo's credibility – a determination which is left to the trier of fact.

Because Roadway is the movant, any inferences that are to be drawn from the facts must be resolved in favor of Mingo. Given the circumstances *as a whole*, the court finds that the facts could justify an inference that these incidents created a hostile environment. Thus, a reasonable juror could find that the incidents alleged here represent the type of conduct that is deeply offensive or severe. Therefore, the court finds that there is a genuine issue of material fact on whether the alleged conduct was severe – making Mingo's work environment hostile – which

precludes summary judgment on her sexual harassment claim. Accordingly, the court denies Roadway's motion for summary judgment as to Mingo's sexual harassment claim.

**E.** **Discrimination Claim**

Mingo claims that she was discriminated against because of her sex when she was denied a seven-on/seven-off work schedule. (Compl. ¶ 16.) Roadway argues that (1) Mingo has failed to allege an adverse employment action; (2) there is no direct evidence of discrimination; (3) Mingo cannot satisfy a prima facie case; and (4) alternatively, Mingo has not presented any evidence of pretext.

Title VII makes it unlawful for an employer to discriminate "against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion," or sex. 42 U.S.C. § 2000e-2(a)(1). Discrimination may be established in either of two ways – through direct evidence or through the indirect burden-shifting method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See McCarthy v. Kemper Life Ins. Cos.*, 924 F.2d 683, 686 (7th Cir. 1991). Mingo has not presented any evidence that her sex played a role in the denial of the seven-on/seven-off schedule. Thus, her claim will be analyzed under the *McDonnell Douglas* burden-shifting method.

Under *McDonnell Douglas*, the plaintiff must first establish, by a preponderance of the evidence, a prima facie case of employment discrimination. 411 U.S. at 802. To establish a prima facie case, Mingo must show: (1) that she belongs to a protected group; (2) that she performed satisfactorily; (3) that her employer subjected her to an adverse employment action; and (4) that similarly-situated employees outside her classification received more favorable

treatment. *Hughes v. Brown*, 20 F.3d 745, 746 (7th Cir. 1994). If Mingo establishes a prima facie case, then the burden shifts to Roadway "to articulate a legitimate, nondiscriminatory reason for its allegedly biased employment decision." *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996). If Roadway meets its burden, then the burden shifts back to Mingo to establish, by a preponderance of the evidence, that Roadway's stated reason is nothing more than pretext. *Id.*

### 1.    The prima facie case

Mingo's claims of employment discrimination are based on Roadway's denial of a seven-on/seven-off work schedule. Mingo is a female and, therefore, is a member of a protected class. Accordingly, the first element of her prima facie is undisputed. However, Roadway contends that Mingo has failed to establish the remaining elements of her prima facie case.

Roadway alleges that Mingo has failed to establish that she was performing satisfactorily. With respect to Mingo's performance, the record is replete with warnings, reprimands, and "poor" and/or "marginal" evaluations. Mingo has offered no evidence to refute these documents. Thus, Mingo has failed to establish the second element of her prima facie case.

Second, Roadway alleges that Mingo has failed to establish the third element – an adverse employment action – of her prima facie case for discrimination. Although an "adverse employment action has been defined quite broadly" by the Seventh Circuit, *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996), the court has noted that "not everything that makes an employee unhappy is an actionable adverse action." *Id.* Indeed, minor and trivial employment actions and employment actions that merely inconvenience the employee are not actionable. *See*

28

*id.*; *see also Lederer v. Argonaut Ins. Co.*, No 98 C 3251, 2000 WL 126933, at *9 (N.D. Ill. Jan. 28, 2000). Instead, the action must materially affect the employment conditions. *Johnson*, 91 F.3d at 932. "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993).

In this case, Mingo retained the same job, title, salary and benefits. However, Mingo claims that she suffered an adverse employment action when she was denied a switch in her work schedule from her five-on/two-off to a seven-on/seven-off schedule. This schedule switch would not have resulted in an increase in Mingo's salary, title, rank, or benefits, nor would it have affected her responsibilities or the hours Mingo was expected to work. (Def.'s App., Ex. A.) It would have, however, required Mingo to perform duties in areas of the dock in which she had never worked. (*Id.*) Mingo presents no evidence that the denial of a change in shift to a seven-on/seven-off schedule materially affected her employment. While she may have preferred a different schedule, Roadway's denial of the change in work shift is not an actionable employment action. Thus, Mingo has failed to establish the third element of her prima facie case.

Third, Roadway alleges that Mingo has failed to establish the fourth element of her prima facie case for her discrimination claim. Mingo claims that other men were "hired off the street" and given the seven-on/seven-off schedule. However, Mingo does not provide the names of any males with her experience and performance ratings that were given a seven-on/seven-off work

schedule. Mingo does claim that Mikolajczak stated that other, newly-hired males were given a seven-on/seven-off schedule, but his deposition testimony does not support this contention. On the contrary, Mikolajczak stated that one unidentified male worked the seven-on/seven-off schedule during his *training*: "He was in training. He didn't get hired into it." (Pl.'s App., Ex. 3 at 62:22-24.) Thus, not only does Mingo not identify a single, similarly-situated male who was given a seven-on/seven-off schedule, but the record does not support even a general statement that other males were given that shift. In fact, Roadway has stated that several male dock supervisors did not work a seven-on/seven-off schedule. (Def.'s App., Ex. A at ¶ 13.) Thus, Mingo has failed to satisfy the fourth element of her prima facie case for discrimination.

In sum, Mingo has failed to produce any evidence that she was performing satisfactorily, that she was adversely affected by the denial of a seven-on/seven-off schedule, and that similarly-situated males were treated differently (*i.e.,* given a seven-on/seven-off schedule). Accordingly, the court finds that Mingo has failed to establish her prima facie case for her denial of the seven-on/seven-off work schedule.

### 2. Legitimate, nondiscriminatory reason

Furthermore, even if Mingo had established her prima facie case, Roadway has established a legitimate, nondiscriminatory reason for denying her the seven-on/seven-off work schedule. Roadway contends that Mingo was not given the seven-on/seven-off schedule because of her poor performance. Specifically, Kaminski stated that he told Mingo the reason he did not offer her that schedule was because "[t]here were several significant gaps in [Mingo's] present performance and they needed to be addressed." (Def.'s App., Ex. R.) This statement is further

30

supported by the record as the evidence shows that Mingo was reprimanded and warned on numerous occasions about errors she made at work. (*See id.*, Exs. G, H, J-M, O-Q.) Further, Mingo was told that she would be considered for that schedule if her work improved in the following couple of months. Unfortunately, her performance did not improve and she was terminated. As the Seventh Circuit has stated, the court will "not sit as a super-personnel department that reexamines an entity's business decisions." *Debs v. Northeastern Ill. Univ.*, 153 F.3d 390, 396 (7th Cir. 1998) (citations omitted). Thus, Roadway has offered a legitimate, nondiscriminatory reason for not offering the seven-on/seven-off schedule to Mingo.

### 3. Pretext

Because Roadway established a legitimate, nondiscriminatory reason for its decision, Mingo must now show that the proffered reason is pretextual. In order to do so, Mingo must "*specifically* refute the facts which allegedly support the employer's proffered reasons." *Mills v. First Fed. Sav. & Loan Ass'n*, 83 F.3d 833, 845 (7th Cir. 1996) (citations omitted) (emphasis in original). There are three ways to show that the proffered nondiscriminatory reason is pretextual: (1) the employer's explanation has no basis in fact; (2) the explanation is not the "real" reason; or (3) the explanation is insufficient to warrant the adverse employment action. *Id.*

In this case, Mingo has not addressed any of the aforementioned methods for establishing pretext. In fact, Mingo has done nothing but assert, generally, that Roadway's reason was pretextual. On the contrary, the court finds that Roadway's reason is clearly supported in fact given the numerous, negative performance reviews and reprimands Mingo was given and which

31

are part of the record. Second, Mingo does not provide this court with any evidence that Roadway's motive to deny her a seven-on/seven-off schedule was gender motivated and, thus, her performance was not the "real" reason. Finally, the court finds that this explanation – namely Mingo's poor performance – is sufficient to warrant the denial of a seven-on/seven-off schedule especially in light of the fact that Kaminski told her that if she improved over the following months, they could revisit the issue of a change in her schedule. Thus, Mingo has not provided any evidence – or any real argument, for that matter – to show that Roadway's proffered reason for not offering her a seven-on/seven-off schedule was pretextual.

In sum, Mingo has not established a prima facie case of discrimination for her claim that she was denied a seven-on/seven-off schedule because of her gender. However, even if she was able to establish her prima facie case, Mingo has failed to show that Roadway's proffered, nondiscriminatory reason for not offering her that schedule was pretextual or a lie. Accordingly, Roadway is entitled to summary judgment in its favor on Mingo's sex discrimination claim.

**F.**     **Retaliation Claim**

Mingo claims that her termination was in retaliation for her refusing to submit to the sexual advances of Roadway's employees. (Compl. ¶ 17.) In its motion for summary judgment, Roadway argues that there is no evidence of any causal link between the decision to fire her and any alleged sexual harassment. Alternatively, Roadway argues that Mingo was terminated because of her poor performance.

Title VII prohibits retaliation against any employee who has engaged in activity protected by the Act. 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation, Mingo must

32

establish that (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse employment action. *Parkins*, 163 F.3d at 1038; *Eilnad v. Trinity Hosp.*, 150 F.3d 747, 753 (7th Cir. 1998). If Mingo establishes these elements, the burden shifts to Roadway to show that it had a legitimate, nondiscriminatory, non-retaliatory reason for its action. *Parkins*, 163 F.3d at 1038; *see also Sanchez v. Henderson*, 188 F.3d 740, 746 (7th Cir. 1999). If Roadway can provide evidence of a legitimate reason for its actions, then the burden shifts back to Mingo to establish that the proffered reason is merely pretextual. *Parkins*, 163 F.3d at 1038; *Sanchez*, 188 F.3d at 746.

In this case, Roadway only challenges the third element of Mingo's prima facie case of retaliation – that being the causal link between her protected activity and Roadway terminating her employment. Specifically, Roadway argues that Kaminski alone decided to terminate Mingo's employment and that Kaminski did not have any knowledge of any harassment suffered by Mingo or of her complaints of such harassment. Thus, Roadway argues, there can be no causal link between her complaints of sexual harassment and the decision to terminate her employment. The court agrees.

A critical issue in determining whether there is a causal connection is "whether the person who made the decision to terminate [Mingo's] employment was aware of the discrimination allegations at the time..." *Maarouf v. Walker Mfg. Co.*, 210 F.3d 750, 755 (7th Cir. 2000). In fact, the Seventh Circuit has stated that absent such knowledge on the part of the decision-maker,

a plaintiff lacks a causal link between her termination and the complaint of discrimination or harassment. *Id.* (citing *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994)).

It is undisputed that Kaminski was the sole decision-maker involved in terminating Mingo's employment. Mingo has not produced any evidence that Kaminski knew of her sexual harassment complaints. In fact, Mingo admits that the only person to whom she reported her complaints was Mikolajczak. Further, in his deposition, Mikolajczak admitted that he did not report Mingo's complaints to anyone else. (Pl.'s App., Ex. 3 at 15:9-11.) Moreover, Mikolajczak stated that, not only did he not make the decision to terminate Mingo, but that he did not even recommend she be terminated. (*See id.* at 70:14-23.) The record clearly shows that Kaminski made the decision to terminate Mingo independent of Mikolajczak. Mingo has not established any evidence – nor has she even asserted – that Kaminski knew of her sexual harassment complaints. Thus, there is no evidence of any connection between the decision to terminate Mingo and her complaints of sexual harassment.[4] *See Ramsey v. United Airlines, Inc.*, No. 98 C 7518, 2000 WL 1367947, at *10 (N.D. Ill. Sept. 14, 2000) (holding that because the plaintiff failed to produce any evidence from which a jury could reasonably infer knowledge on the part

---

[4]Although Mingo never raises this argument, a causal connection can also be established by showing that there was a "suspiciously short period of time" between her complaint and the adverse employment action. *Parkins*, 163 F.3d at 1039. In this case, Mingo complained to Mikolajczak on August 22, 1998; her employment was terminated on August 29, 1998. Thus, there is a short time between her complaints of sexual harassment and her termination. However, because, after examining the record, the court finds that Kaminski had no knowledge of those complaints, the court finds that there is no causal connection between the protected activity and the employment action.

of the decision-makers, he could not state a prima facie case of retaliation) (citing *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1007 (7th Cir. 2000)).

Further, even if there existed some tenuous link between Mingo's complaints and Roadway's actions, Roadway has offered a legitimate, nondiscriminatory reason for her termination. Specifically, Roadway states that Mingo was terminated because of her poor performance on the job. In support of this claim, Roadway cites to various performance evaluations in which Mingo was rated at a marginal and/or poor level. Further, Roadway has cited to portions of the record which evidence the numerous mistakes and deficiencies for which Mingo was reprimanded. Given these numerous reprimands and her failure to improve her work, the evidence in the record clearly supports Roadway's proffered legitimate, nondiscriminatory reason for terminating Mingo's employment. *See infra* Sect. II.E.3. While Mingo claims that her performance evaluations – used in the decision to terminate her – were rated lower than her male counterparts, she offers no evidence of those men's performance evaluations. In fact, the only evaluations contained in the record are Mingo's. Moreover, while Mingo claims that her mistakes were common among the supervisors, the record does not support this claim. Mingo has not produced any evidence that other supervisors made similar mistakes as frequently as she did. In fact, her manager, Mikolajczak, stated that Mingo was the worst of the supervisors. (Def.'s Supp. App., Ex. C at 66:10-12.). Thus, Mingo has failed to produce any evidence that Roadway's legitimate, nondiscriminatory reason for her termination was pretextual. Accordingly, Roadway is entitled to summary judgment in its favor on Mingo's retaliation claim.

## III. **CONCLUSION**

For the foregoing reasons, the court grants in part and denies in part Roadway's motion

for summary judgment. Roadway is entitled to summary judgment in its favor on Mingo's sex

discrimination and retaliation claims. The court denies Roadway's motion for summary judgment

on Mingo's sexual harassment claim. Further, the court grants Roadway's motion *in limine*.

Date: MAR 2 0 2001

James H. Alesia
United States District Judge

36